Collin Seals (SBN 249534)
*collin@sealsphillips.com*
Mark R. Phillips (SBN 223289)
*mark@sealsphillips.com*
SEALS PHILLIPS LLP
301 N. Lake Ave., Suite 600
Pasadena, California  91101
Telephone:   626.240.0632
Facsimile:    626.240.0700
*Designated Local Counsel*

Timothy R. Clinton
*tim@clintonpeed.com*
CLINTON & PEED
1775 Eye Street NW, Ste. 1150
Washington, DC 20006
(202) 919-9591
(202) 587-5601 (fax)
*Application pro hac vice pending*

Attorneys for Plaintiff
THE PRODUCTION PIT, LTD.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PRODUCTION PIT LTD.<br><br>Plaintiff,<br><br>v.<br><br>WARNER BROS. ENTERTAINMENT INC.<br>Defendant.<br><br>Defendants. | **Case No. 5:24-cv-1097**<br><br>**COMPLAINT FOR DECLARATORY RELIEF; DAMAGES; AND INJUNCTIVE RELIEF**<br><br><br>**JURY TRIAL REQUESTED** |

SEALS PHILLIPS LLP

COMPLAINT

Plaintiff, The Production Pit Limited, for its Complaint for Declaratory Relief, Injunctive Relief, and Damages against Defendant Warner Bros. Entertainment Inc., hereby alleges as follows:

**INTRODUCTION**

1.　This case involves ownership and infringement in the United States and abroad of copyright rights in certain sound recordings related to J.K. Rowling's and Defendant Warner Bros. Entertainment Inc.'s ("Warner") famous Harry Potter® franchise. With Warner's knowledge and authorization, Plaintiff, The Production Pit Limited ("TPP"), created the sound recordings at the request of a non-party consumer products company named Cards Inc., which had obtained Warner's permission to use certain Harry Potter-related content in one particular toy to be distributed in one particular region. In the sound recordings, TPP's principal, Marc Silk—an acclaimed British voice actor—portrays the "Sorting Hat"™ character from Ms. Rowling's Harry Potter saga.

2.　More specifically, Warner had authorized Cards Inc. to use copyrighted expression from the Harry Potter universe, including the Sorting Hat character itself and certain spoken lines associated with it, for purposes of producing and marketing a plush "talking" Sorting Hat replica. Warner further authorized Cards Inc. to engage a voice actor to perform and record the approved lines in order to create the character-voice of this animatronic Sorting Hat. In doing so, Warner authorized the creation of a derivative work based on and adapted from Ms. Rowling's copyrighted Harry Potter novels and Warner's successful film adaptions of the same. Cards Inc., in turn, engaged TPP to perform and record the Sorting Hat character-voice for the toy.

3.　But Warner did not take the steps necessary to obtain the intellectual property rights in the sound recordings TPP created.  Accordingly, under applicable law, TPP automatically and immediately owned all copyright rights in those sound recordings as soon as they were created, and TPP has never transferred those rights.

COMPLAINT

4.      TPP never authorized Warner or any other party to copy or to use the sound recordings it created in any way other than as part of the particular plush "talking" Sorting Hat toy referenced above, and only for distribution in Europe, the Middle East, and Africa.

5.      Warner has nevertheless proceeded for years to extensively copy and use, and to authorize numerous third parties to copy and use, TPP's sound recordings without TPP's permission. In doing so, Warner has infringed TPP's copyright rights directly, vicariously, and contributorily.

6.      Through this action, TPP seeks (a) a declaration that it owns all copyright rights in the sound recordings, (b) appropriate injunctive and other equitable relief to prevent further irreparable injury; and (c) damages and disgorgement of profits to compensate it for Warner's widespread and multifarious infringement of those rights and for infringement committed by the numerous third parties that Warner has authorized.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the U.S. Copyright Act, 17 U.S.C. § 101, et seq. and The Berne Convention for the Protection of Literary and Artistic Works (the "Berne Convention"). Pursuant to 28 U.S.C. § 1367, the Court may exercise supplemental jurisdiction over the claims arising under the laws of the United Kingdom because they arise out of the same nucleus of operative fact as, and are so related to, claims in the action within such original jurisdiction that they form part of the same case or controversy.

8.      The Court has the power to issue declaratory relief pursuant the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq.

9.      Pursuant to Cal. Code Civ. Proc § 410.10 and principles of constitutional due process, the Court may exercise personal jurisdiction over Defendant Warner because it resides, maintains a continuous, systematic presence, and has purposely

- 3 -

availed itself of doing business in this judicial district, and because, on information and belief, the acts and omissions from which TPP's claims arise occurred in this district.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant Warner is a resident of and has its principal place of business in, and because a substantial part of the events or omissions giving rise to the claim occurred, in this judicial district.

## PARTIES

11.     Plaintiff TPP is a limited company organized and existing under the laws of the United Kingdom. TPP is the personal services company of the accomplished British voice actor, Marc Silk ("Silk"), who is also a resident of the United Kingdom ("U.K."). Under U.K. law, Silk is an employee of TPP.

12.     Defendant Warner Bros. Entertainment Inc. ("Warner"), an affiliate of the media and entertainment conglomerate Warner Bros.-Discovery, is a Delaware corporation with a principal place of business in Burbank, California.

## FACTUAL ALLEGATIONS

**A. The wildly successful Harry Potter franchise.**

13. J.K. Rowling's ("Rowling") "Harry Potter" franchise (aka "Wizarding World of Harry Potter") requires little introduction. A worldwide phenomenon, it is among the most famous, beloved, and valuable fantasy series of all time.

14. On information and belief, Warner (and/or its affiliates) has long owned certain rights relating to the Harry Potter franchise, including rights to create film and television adaptations of the seven central novels in Rowling's literary series. Each of Warner's original Harry Potter film adaptations has been an enormous commercial blockbuster, and speculation and reports about a future television series have been widespread. On information and belief, Warner (and/or its affiliates) also owns certain rights relating to consumer products and merchandise associated with the Harry Potter franchise, including approval rights in certain instances.

15. Among the iconic characters in Rowling's fictional Harry Potter universe is the so-called "Sorting Hat"— a sentient and vocal magical hat that determines which of the four Hogwarts boarding school "houses" (Gryffindor, Hufflepuff, Ravenclaw, and Slytherin) is the best fit for each new student. The Sorting Hat appears in several important scenes in Rowling's novels, particularly those involving the traditional "sorting ceremony" that occurs at the beginning of each Hogwarts school year.

16. The Sorting Hat appears in three of Warner's Harry Potter film adaptations. In each, its character-voice was performed by the well-known British actor Leslie Phillips, who died in 2022.

17. On information and belief, like many of the fascinating characters, objects, places, and mysteries in the Harry Potter universe, Warner's Sorting Hat has been the subject of popular and commercially successful consumer products and attractions aimed at Harry Potter fans and the general public in the United States and around the world.

**B. Silk's and TPP's successful voice acting, recording, and production business.**

18. Through his personal services company TPP, Marc Silk has provided voice acting services for franchises such as Star Wars, Thunderbirds Are Go, Danger Mouse, Go Jetters, TMNT, Lego City, Black & White, and Johnny Bravo; and he voiced the titular character (and others) for the United States production of Bob the Builder from 2007 to 2011. TPP operates a studio in Birmingham, England, with a recording space optimized for voice acting, out of which TPP produces Silk's own voice recordings and provides recording and directing services to others.

19. Silk was the host of "Symphonic Star Wars" at the Royal Albert Hall. He is a regular celebrity guest at "Comic Cons" and gaming events. And he is in regular demand as a speaker for creative conferences, at universities and acting schools, and in shows and podcasts about the creative process.

20. Under the copyright laws of the United Kingdom, when Silk works on a TPP project, TPP—as his employer—immediately owns all copyright rights that otherwise would vest in Silk personally upon his creation and fixation of copyrightable expression. At all times relevant to this action, Silk was working as an employee of TPP for purposes of copyright ownership, and all sound recordings relevant to this action were "works made for hire" within the meaning of U.K. law.

21. TPP (and through TPP, Silk) has opportunities to profit in various ways through the character-voice acting and related sound engineering and production services they provide. Those opportunities include, among others, fee for service arrangements, royalty or revenue-sharing agreements, and indirect revenue through speaking engagements, conference appearances, and the like. As a general matter, the more closely Silk becomes associated with a particular character-voice in the minds of consumers, fans, and potential clients, the more likely he is to profit (directly and indirectly) from his work and to benefit from increasing professional renown.

**C. Cards, Inc. engages Silk (via TPP) to perform and record the "Sorting Hat."**

22. In mid-2007, a U.K.-based consumer products / merchandising company— non-party, Cards Inc.—approached Silk about performing voice acting services in connection with a plush animatronic "Sorting Hat" replica toy that Cards Inc. wished to produce and distribute with Warner's permission. Silk, through TPP, was willing to provide voice acting services in connection with the project.

23. On information and belief, Cards Inc. and Warner understood and agreed that it would be necessary or desirable to secure a new performance of the Sorting Hat's character-voice (rather than simply use existing audio footage of Leslie Phillips from Warner's Harry Potter films) because the existing film dialogue in which the Sorting Hat sorts students into the Hogwarts houses was insufficient and inadequate for purposes of the planned toy.

24. For example, whereas the film footage contains no mention of one of the four Hogwarts houses (Ravenclaw), it was desirable that the toy be able to "sort" users into

each of the houses. Thus, a recording of "Ravenclaw" needed to be made for the toy. Similarly, whereas the public would enjoy a few words expressing the essential character of the house into which they were sorted (e.g., "Brave at heart? Daring? Better be . . . Gryffindor!" or "A Ready mind, you belong in . . . Ravenclaw!"), the Sorting Hat never uttered those precise phrases and sequences of lines in the films.

25. On information and belief, another consideration was that Phillips himself was unavailable to perform in connection with the toy project on account of health problems.

26. On information and belief, Cards Inc. and Warner (or its affiliate) negotiated certain licenses and approvals that would be necessary in order for Cards Inc. to use, and to incorporate into its planned talking Sorting Hat toy, certain copyrighted expression from the Harry Potter franchise. On information and belief, Warner, in turn, coordinated with Rowling (or her representatives) to secure from her all rights that would be necessary for that purpose. And, on information and belief, Warner authorized Cards Inc. to engage a voice actor to perform and record the character-voice of the Sorting Hat for use in the toy.

27. Among other things, the Cards Inc. / Warner licensing negotiations involved securing Rowling's and/or Warner's approval of the specific lines that Cards Inc.'s selected voice actor would perform and record, in several different languages, for sound recordings that could be built into the plush Sorting Hat toy (via sound chips commonly found in such toys). The recordings would be activated when a user engaged with toy (e.g., by placing it on one's head, by pressing a button, etc.).

28. On information and belief, Warner ultimately approved and authorized a script for purposes of the Cards Inc. talking plush Sorting Hat. Of the lines appearing in the new script, only the names of three of the four houses (Gryffindor, Slytherin, and Hufflepuff) were spoken in the film; one sentence was taken directly from the first Harry Potter novel ("There's nothing hidden in your head the sorting hat can't see, so try me on and I will tell you where you ought to be"); a handful of words and phrases

were taken from that book and rearranged ("brave at heart," "daring," "just and loyal," "true," "a ready mind," and "cunning"); and the remaining words appeared in neither the books nor the films.

29. Cards Inc. and TPP did not execute a written contract for the creation of the talking Sorting Hat sound recordings, but they orally agreed upon the following terms:

    a.  for a fee of £3,000, Silk would perform and produce the sound recordings, voice acting (in English, French, German, and Spanish), and then engineering in TPP's studio, from the script that Rowling and Warner had approved;

    b.  the sound recordings would be put to only one use—the specific plush Sorting Hat toy for which Cards Inc. had obtained Warner's approval; and

    c.  the toy incorporating TPP's sound recordings would be distributed only in Europe, the Middle East, and Africa (the "EMEA" region of the world).

30. Had Warner and/or Cards Inc. sought broader rights to use TPP's Recordings, TPP would have negotiated for greater compensation and, if an agreement could not be reached, TPP might have declined the engagement altogether.

31. On or about April 25, 2007, Silk performed, recorded, and produced in TPP's recording studio several sets of sound recordings for Cards Inc.'s talking Sorting Hat toy (the "Recordings"). Silk performed, recorded, and produced certain additional and/or revised lines in a subsequent session on June 12, 2007. In each session, no one other than Silk participated in the recitation, recording, or production of the Recordings.

32. In creating the Recordings, Silk exercised substantial and independent creative, artistic, and technical discretion. In his performance and engineering decisions, Silk was inspired by—but sought to (and did) adapt substantially, using new dialogue in a new context—the character-voice of the "Sorting Hat" as portrayed by Phillips in the original Harry Potter film.

33. Silk's creative process began by studying the scenes in which the Sorting Hat character appears in both Rowling's novels and in Warner's film adaptions. He

- 8 -

COMPLAINT

considered the Sorting Hat's personality, mannerisms, and attributes, as revealed in Rowling's written descriptions and as portrayed by Phillips' choice of various speech characteristics (e.g., tempo, dynamics, tone, pitch, enunciation, et cetera).[1]

34. Silk then worked to put his own dramatic spin on the Sorting Hat's character-voice for use in the entirely new setting and context for which TPP was engaged. The new setting and context directly influenced his vocal performance (e.g., tempo, dynamics, tone, pitch, enunciation, et cetera), as well as his choices regarding the recordation and production of the Recordings.

35. Far from slavish copies of anything then in existence relating to the Harry Potter universe, the Recordings reflect Silk's original creative expression in important respects. As compared to the Harry Potter-related works on which they are based, the Recordings contain nontrivial variation sufficient to render them meaningfully distinguishable from those prior works.

36. For example, the Sorting Hat says "Slytherin" only twice in the films. The first time, it exclaims "Slytherin!" in excited and clipped tones before the hat ever touches Draco Malfoy's head—part of a comedic gag meant to reveal how clearly Draco Malfoy (a key antagonist throughout most of the story) belongs in that house. The second time, the Sorting Hat mentions Slytherin in passing ("Not Slytherin, eh?") while considering where to place the story's protagonist, Harry Potter. As for the books, the Sorting Hat similarly mentions Slytherin twice, but in the context of a song.

37. But Silk, in his artistic judgment, determined that none of the prior portrayals conveyed the sense of playful anticipation and triumphant proclamation that would make sense in the context of a Sorting Hat plush toy to be used by Potter fans of every age and background. Accordingly, when recording the lines relating to that house—

---

[1] Notably, Silk did not reference the English-language audiobook performances of acclaimed voice actor Jim Dale, which themselves reflected dramatically different artistic choices relating to the Sorting Hat as compared to those of Phillips.

"Cunning, shrewd! Mmmm, let's see . . . Slytherin!²"—Silk made his own creative choices regarding tempo, pitch, dynamics, tone, rhythm, enunciation, and other factors necessary to create an appropriate—and completely novel—recording.

38. Silk's performances of the French, German, and Spanish versions of the script varied even more from the original dubbed film recordings, which were performed by actors other than Leslie Phillips (e.g., Ramón Repáraz performed the Spanish-language dubbed version). For these foreign-language recordings, Silk did not reference the original film recordings at all.

39. Silk applied these kinds of nuanced artistic judgments to each line he recorded, in each language, to make them appropriate for the particular context in which Cards Inc. intended to use the Recordings.

40. Under U.K. copyright law, as the sole creator (or "author") of the Recordings, all copyright rights in and to the Recordings ordinarily would have vested in Silk automatically and immediately upon their creation and fixation; however, by virtue of his employment relationship with TPP, all such rights in fact automatically and immediately vested in TPP.

41. Silk subsequently delivered copies of the finished Recordings as master audio / WAV files to Cards Inc. by email.

42. On information and belief, Cards Inc. provided copies of the finished Recordings to Warner for Warner's final review and approval in connection with the plush talking Sorting Hat toy. In particular, on information and belief, Cards Inc. delivered the Recordings via digital upload to a Warner online portal used specifically for such approval processes.

---

² The word "cunning" appears in the context of Slytherin during a song performed by the Sorting Hat in the book *Harry Potter and the Philosopher's Stone* (named "*Harry Potter and the Sorcerer's Stone*" in the U.S. version), but the word "shrewd" and the phrase, "Mmmm, let's see . . ." appears in neither the books nor the films.

43. On information and belief, Warner subsequently approved the Recordings for use in the Cards Inc. toy.

44. Following Silk's creation of the Recordings, and consistent with Cards Inc.'s instructions, TPP issued invoices for his services to "Popco Entertainment Limited." A first invoice was issued on May 31, 2007 (for the April 25 session), and the second was issued on June 30, 2007 (for the June 12 session). TPP subsequently received payment, in the total amount of £3,200, as had been agreed.

45. Neither TPP nor Silk ever assigned to Cards Inc.—or to anyone else—any copyright rights in the Recordings. Nor did TPP or Silk ever license or authorize anyone to use the Recordings in ways other than those expressly described above.

46. Silk does not know whether Cards Inc. ever manufactured or sold the planned talking Sorting Hat toy. Nor, until many years later, did Silk have reason to suspect that Cards Inc. or Warner was using the Recordings in any ways other than in that one agreed product.

**D. TPP contacts Warner about the infringements.**

47. On or about November 6, 2021, Silk discovered that identical copies of the Recordings had been used without his permission. That discovery occurred when a friend sent him the following Internet link, at which Hallmark was selling—as it continues to sell today—a product entitled "Harry Potter™ Sorting Hat™ Ornament With Sound and Motion": https://perma.cc/5CTK-X8NQ (permalink taken from hallmark.com).

48. Silk proceeded to investigate the matter and discovered that, to his great surprise, identical or near-identical copies of the Recordings had been and were being made, used, distributed, and played publicly in numerous different ways without his permission in the U.S. and around the world.

49. Among the unauthorized copies and uses that Silk discovered were at least a dozen "talking" Sorting Hat consumer products that, on information and belief, have incorporated copies of TPP's Recordings, and numerous videos (on television and

online) in which copies of the Recordings have been used for a wide variety of commercial and promotional uses. The Recordings have also been used in connection with live performances at Harry Potter-themed attractions in the U.S. and around the world, including at "The Wizarding World of Harry Potter" area of Universal Studios theme parks, Harry Potter traveling exhibitions, and the like. A summary of the infringements that TPP has discovered thus far (and website links evidencing such infringements) includes:

    a. <u>Products</u>:

        i. Running Press Harry Potter Talking Sorting Hat and Sticker Book (https://bit.ly/4arK4hh; https://bit.ly/4bppUpv (at 1:54));

        ii. Spinmaster Wizarding World Sorting Hat (https://perma.cc/66GM-95GN; https://bit.ly/4br1uM7);

        iii. Universal Studios Wizarding World Of Harry Potter Animated Sorting Hat (https://perma.cc/V6CX-TKBV; https://bit.ly/3K7rMaa (at 2:33, 2:59, 3:10, 3:24 & 3:37));

        iv. YuMe Harry Potter Real Talking Sorting Hat (https://perma.cc/K8SC-JW7X);

        v. Build-A-Bear Sorting Hat With Sound (https://perma.cc/52AS-JPA3; https://bit.ly/3URGTd2 (at 1:32));

        vi. YuMe Harry Potter Mini Sorting Hat with Sound (https://perma.cc/MT27-WBDZ; https://bit.ly/44RR71m (at 2:16); https://bit.ly/3V5ZOlD);

        vii. WOW! Stuff Collection Harry Potter Sorting Hat Keyring (https://perma.cc/2438-NEQ4; https://amzn.to/3WPJTcC);

        viii. ABYstyle Harry Potter Cushion Talking Sorting Hat (https://perma.cc/P3ZC-XUJ7 (Select "ABYstyle Europe"); https://bit.ly/3KawT9O (at 0:24));

      ix.  The Noble Collection - Electronic Interactive Sorting Hat (https://perma.cc/29K8-XXWW; https://bit.ly/3QRTgoc (at 1:46, 4:06, 4:57, 5:18 & 5:40));

      x.  harrpottershop.com Animated Sorting Hat (https://perma.cc/4RYN-NN6H);

      xi.  Hallmark Harry Potter Sorting Hat Ornament with Sound and Motion (https://perma.cc/AA3H-DF83); and

      xii.  LEGO Talking Sorting Hat (https://perma.cc/TBC6-KNVR);

  b.  <u>Paid Visitor Attractions</u>:

      i.  Universal Studios Florida (https://bit.ly/3KbpHKG (at 0:12, 0:30, 1:09, 1:24, 1:56, 2:22 & 2:36); https://bit.ly/3UH5NM8 (at 0:07 & 0:44));

      ii.  Warner Bros. Studio Tour Hollywood (https://bit.ly/3WJrcHn (at 0:13 & 0:23));

      iii.  Harry Potter Exhibition Tour (Chicago, IL; Boston, MA; Toronto, Ontario; Seattle, WA; New York, NY; Sydney, Australia; Singapore; Tokyo, Japan; Edmonton, Alberta; Sweden; Germany; France; China; Belgium; Netherlands; Spain; Italy; Germany; Portugal) (https://bit.ly/3ytVALR (at 0:45));

      iv.  "The Sorting Ceremony" Magical Moments Warner Bros. Official "Wizarding World" YouTube Channel (https://bit.ly/4ashFYf (at 1:05, 1:21 & 1:56));

      v.  Live With Kelly and Ryan - Top Toys Holiday Gift Guide - ABC TV (https://bit.ly/3V8aoss (at 4:40));

      vi.  The Masked Singer - Season 10, Episode 6 - Harry Potter Night (Commercial/Promo) (https://bit.ly/3QSvs3I (at 0:15));

vii. The Masked Singer - Season 10, Episode 6 - Harry Potter Night (Episode) (https://bit.ly/3K8IDJP (at 2:24, 7:10, 14:05, 19:58 & 27:03)).

50. TPP does not know whether—but believes it is likely—that other infringements have occurred and/or are occurring as well.

51. On information and belief, Warner aggressively protects its intellectual property around the world, and few (if any) of the infringing copies and uses that TPP has discovered thus far occurred without Warner's knowledge, involvement, and/or consent.

52. On information and belief, some or all of the infringements were induced, encouraged, authorized, incentivized, directed, and/or permitted by Warner, and Warner has profited from some or all of the infringements. For example, Hallmark's advertisement for the talking ornament product mentioned above includes Warner's logo and expressly acknowledges that "WIZARDING WORLD characters, names and related indicia are © & ™ Warner Bros. Entertainment Inc. WB SHIELD: © & ™ WBEI. Publishing Rights © JKR. (s23)." https://perma.cc/5CTK-X8NQ.

53. Except for use of the Recordings in connection with the Cards Inc. toy as agreed between TPP and Cards Inc., Warner's acts of copying, importing, exporting, distributing, and publicly playing copies of the Recordings—and those of any third party whom Warner authorized—were undertaken without TPP's authorization, consent, or knowledge, and without any remuneration to TPP.

**E. Warner and its licensees continue to violate TPP's rights after learning about them.**

54. On December 2, 2021, TPP, through counsel in the U.K., contacted Warner to notify it of TPP's claim of copyright ownership in the Recordings. Subsequent discussions ensued, but TPP and Warner were unable to resolve the matter. During those discussions, counsel for Warner indicated that TPP would need to file a lawsuit in order to try to prove TPP's claim and vindicate its rights. In doing so, Warner's

counsel clearly advised that "Warner Entertainment Inc." was the "proper party" to any litigation involving TPP's claim of copyright rights in the Recordings.

55. Since inviting TPP to file suit, Warner and those whom it has authorized to copy, use, and distribute the Recordings have continued to infringe TPP's rights. In fact, infringing uses of the Recordings have expanded.

56. Most notably, it recently came to TPP's attention that LEGO® Group is marketing and selling—to great fanfare among LEGO and *Harry Potter* aficionados—a new talking "Sorting Hat" product with a unique "sound brick" that has been promoted as containing 31 various phrases from the *Harry Potter* franchise. Numerous videos are circulating on social media sites depicting, describing, and discussing this exciting new LEGO product, and examples of the "talking" sound brick play a prominent role in many of them. The LEGO product and sound brick incorporates identical copies of the Recordings.

## CLAIMS FOR RELIEF

### Count I: Declaratory Judgment

### (28 U.S.C. § 2201, et seq.; 17 U.S.C. § 101, et seq.)

57. TPP realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

58. The foregoing allegations indicate that there is an actual justiciable controversy concerning ownership of the copyright rights in and to the Recordings.

59. By permitting and approving Cards Inc.'s use of copyrighted content from the Harry Potter franchise, Warner (with Rowling's approval to the extent necessary) authorized the preparation of a derivative work based upon that copyrighted content—namely, a plush animatronic Sorting Hat toy that would incorporate the Sorting Hat character and a new character-voice performance of lines based generally on text from *Harry Potter and the Philosopher's/Sorcerer's Stone.*

60. Retained by Cards Inc. as an independent contractor, TPP (and its owner/employee Silk) prepared the Recordings—an authorized derivative work based on copyrighted Harry Potter content.

61. In making the Recordings, Silk exercised substantial independent artistic choice and creative and technical discretion. The Recordings consist largely of never-before-recorded lines of text inspired by prior portrays of the Sorting Hat character, and contain nontrivial variation sufficient to render them meaningfully distinguishable from the prior Harry Potter works on which they are based. The original expression in the Recordings is thus entitled to copyright protection as a derivative work.

62. As the author solely responsible for creating (or "authoring") the Recordings, the copyright rights in the Recordings ordinarily would have vested in Silk immediately and automatically upon creation and fixation thereof. However, by virtue of Silk's employment relationship with TPP, under U.K. copyright law the Recordings were "works made for hire," the copyright rights in which vested in TPP instead. TPP therefore owned all copyright rights in and to the Recordings as soon as they were created. *See* U.K. Copyright, Designs and Patents Act 1988 § 11(2).

63. TPP authorized Cards Inc. to make copies of the Recordings for incorporation in a plush talking Sorting Hat toy to be distributed in the EMEA region only. But neither Silk nor TPP ever authorized anyone, including Warner or its licensees, to copy or otherwise use the Recordings in any other way.

64. Under U.K. law (*see* Copyright, Designs and Patents Act 1988 § 90(3)) and the U.S. Copyright Act (*see* 17 U.S.C. § 204), an assignment of copyright rights requires a writing signed by or on behalf of the assignor. Neither TPP nor Silk has ever signed any such writing with respect to the copyright rights in the Recordings.

65. Accordingly, TPP originally was, remains, and has always been the sole owner of all copyright rights in the Recordings.

66. The failure to control the exclusive rights that applicable copyright law affords copyright owners causes irreparable injury to TPP. In the absence of a judicial declaration that TPP owns all copyright rights in the Recordings, TPP will continue to suffer irreparable injury.

## Count II: Direct Copyright Infringement
## (17 U.S.C. § 101, et seq.)

67. TPP realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

68. TPP owns all copyright rights in the Recordings.

69. The Recordings are not a United States work.

70. TPP has not obtained a U.S. copyright registration for the Recordings; however, under The Berne Convention, to which the U.K. is a party, a registration is not a prerequisite to TPP's infringement suit in this Court. *See* Berne Convention art. 5(2).

71. Warner had access to the Recordings because Cards Inc. delivered copies of them to Warner for purposes of obtaining approval to use them in the talking Sorting Hat toy.

72. Each of the infringing uses of which Silk is currently aware, as summarized in Paragraph 49 hereto, involves creation, distribution, and/or importation into or exportation from the U.S. of an identical or substantially similar copy of the Recordings that Silk did not authorize.

73. Warner, together with those whom it has authorized, has infringed TPP's exclusive rights to reproduce the Recordings in phonorecords (17 U.S.C. § 106(1)); to distribute phonorecords of the Recordings to the public by sale or other transfer of ownership, or by rental, lease, or lending (17 U.S.C. § 106(3)); and to import into and/or export from the U.S. infringing phonorecords of the Recordings without TPP's permission (17 U.S.C. § 602(a)).

74. Substantial portions of the infringing acts of Warner, and of those whom it has authorized to infringe, have taken place in the U.S.

75. To the extent infringing acts have taken place abroad, Warner Bros committed predicate acts in the U.S. that authorized and enabled such infringement.

76. Warner's infringing conduct alleged herein was and continues to be willful and with full knowledge of TPP's rights in the Recordings and has enabled Warner illegally to obtain profit therefrom.

77. As a direct and proximate result of Warner's infringing conduct, and the conduct of those whom Warner has authorized, encouraged, incentivized, and directed to infringe, TPP has been harmed and is entitled to damages in an amount to be proven at trial. Pursuant to 17 U.S.C. § 504(b), TPP is also entitled to (a) recover Warner's profits attributable to Defendant's infringing conduct alleged herein, including from any and all sales of products that infringe TPP's rights, and (b) an accounting of and creation of a constructive trust with respect to such profits.

78. TPP is entitled to its costs pursuant to 17 U.S.C. § 505.

79. As a direct and proximate result of Warner's infringing conduct alleged herein, TPP has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. On information and belief, unless the Court enjoins Warner's infringing conduct, Warner and those whom it authorizes will continue to infringe the Recordings. TPP is therefore entitled to permanent injunctive relief, consistent with traditional principles of equity, restraining and enjoining such ongoing infringing conduct.

### Count III: Contributory Copyright Infringement
### (17 U.S.C. § 101, et seq.)

80. TPP realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

81. In many or all of the instances in which TPP's copyright rights in the Recordings have been infringed by third parties—e.g., manufacturers, importers, exporters, sellers, and business proprietors—Warner (a) knew and/or was willfully blind to their direct infringement and (b) induced, caused, or materially contributed to their direct infringement, including by purporting to own the rights necessary to authorize others to copy, distribute, import, export, and otherwise make use of the Recordings.

82. Warner's acts in connection with and in support of such third parties' acts have been and continue to be substantial and directly related to such principal infringement.

83. Substantial portions of Warner's contributorily infringing acts, and the acts of those whom Warner has authorized to infringe, have taken place in the U.S.

84. To the extent infringing acts have taken place abroad, Warner committed predicate acts in the U.S. that authorized, enabled, and otherwise contributed substantially and directly to such infringement.

85. Warner's contributorily infringing conduct alleged herein was and continues to be willful and with full knowledge of TPP's rights in the Recordings, and has enabled Warner to obtain profit illegally therefrom.

86. As a direct and proximate result of Warner's contributorily infringing conduct, and the conduct of those whom Warner has authorized, encouraged, incentivized, induced, and directed to infringe, TPP has been harmed and is entitled to damages in an amount to be proven at trial. Pursuant to 17 U.S.C. § 504(b), TPP is also entitled to (a) recover Warner's profits attributable to Defendant's infringing conduct alleged herein, including from any and all sales of products that infringe TPP's right, and (b) an accounting of and creation of a constructive trust with respect to such profits.

87. TPP is entitled to its costs pursuant to 17 U.S.C. § 505.

88. As a direct and proximate result of the Warner's contributorily infringing conduct alleged herein, TPP has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. On

information and belief, unless the Court enjoins Warner's infringing conduct, Warner and those whom it authorizes will continue to infringe the Recordings. TPP is therefore entitled to permanent injunctive relief, consistent with traditional principles of equity, restraining and enjoining such ongoing infringing conduct.

**Count IV: Vicarious Copyright Infringement**

**(17 U.S.C. § 101, et seq.)**

89. TPP realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

90. In many or all of the instances in which TPP's copyright rights in the Recordings have been infringed by third parties—e.g., manufacturers, importers, exporters, sellers, and business proprietors—Warner had the right and ability to supervise the infringing activity as well as a direct financial interest in such third parties' activities, including through licensing and other authorizing agreements in which Warner purports to own the rights necessary to authorize others to copy, distribute, import, export, and otherwise make use of the Recordings.

91. Warner's acts in connection with and in support of such third parties' acts have been and continue to be substantial and directly related to such principal infringement.

92. Warner's vicariously infringing conduct alleged herein was and continues to be willful and with full knowledge of TPP's rights in the Recordings and has enabled Warner to profit illegally therefrom.

93. As a direct and proximate result of Warner's vicariously infringing conduct, and the conduct of those whom Warner has authorized, encouraged, incentivized, induced, and directed to infringe, TPP has been harmed and is entitled to damages in an amount to be proven at trial. Pursuant to 17 U.S.C. § 504(b), TPP is also entitled to (a) recover Warner's profits attributable to Defendant's infringing conduct alleged herein, including from any and all sales of products that infringe TPP's right, and (b) an accounting of and creation of a constructive trust with respect to such profits.

94. TPP is entitled to its costs pursuant to 17 U.S.C. § 505.

95. As a direct and proximate result of the Warner's vicariously infringing conduct alleged herein, TPP has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. On information and belief, unless the Court enjoins Warner's infringing conduct, Warner and those whom it authorizes will continue to infringe the Recordings. TPP is therefore entitled to permanent injunctive relief, consistent with traditional principles of equity, restraining and enjoining such ongoing infringing conduct.

**Count V: Infringement by Performance, Showing or Playing of Work in Public**

**(U.K. Copyright, Designs and Patents Act 1988 § 19(3))**

96. TPP realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

97. Warner, together with those whom it has authorized to play the Recordings in public as part of the theme parks, exhibitions, and other consumer and fan attractions referenced above, has infringed TPP's exclusive right under U.K. law to play or show the Recordings in public.

98. Substantial portions of the infringing acts of Warner's and those whom it has authorized to infringe have taken place in the U.S.

99. To the extent infringing acts have taken place abroad, Warner Bros committed predicate acts in the U.S. that authorized and enabled such infringement.

100. Warner's infringing conduct alleged herein was and continues to be willful and with full knowledge of TPP's rights in the Recordings and has enabled Warner to profit illegally therefrom.

101.     As a direct and proximate result of Warner's infringing conduct, and the conduct of those whom Warner has authorized, encouraged, incentivized, and directed to infringe, TPP has been harmed and is entitled to damages in an amount to be proven at trial.

102.     TPP is entitled to its costs pursuant to 17 U.S.C. § 505.

103.     As a direct and proximate result of the Warner's infringing conduct alleged herein, TPP has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. On information and belief, unless the Court enjoins Warner's infringing conduct, Warner and those whom it authorizes will continue to infringe the Recordings. TPP is therefore entitled to permanent injunctive relief, consistent with traditional principles of equity, restraining and enjoining such ongoing infringing conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, TPP requests judgment against Warner and the following forms of relief:

A. A declaration that TPP owns all copyright rights in the Recordings;

B. A finding that Warner has directly, contributorily, and/or vicariously infringed TPP's copyright rights in violation of 17 U.S.C. § 501 and/or U.K. Copyright, Designs and Patents Act 1988 § 19(3);

C. An injunction permanently enjoining Warner, its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons and entities who receive actual notice of the Court's order by personal service or otherwise, from:

(i)     reproducing, distributing, publicly performing, or creating any derivative works based on the Recordings, or engaging in any other activity that infringes Plaintiff's rights in its Recordings; and

(ii)    manufacturing, distributing, selling, marketing, advertising, promoting, publicly performing or playing, selling phonorecords of the Recordings and/or any products, works, or other materials that include, copy, are derived from, or otherwise incorporate or embody the Recordings or phonorecords thereof;

(iii)   authorizing, instructing, aiding, assisting, or abetting any other individual or entity in doing any act prohibited by the foregoing sub-paragraphs (i) or (ii).

D. Injunctive relief in accordance with 17 U.S.C. § 503 ordering impoundment, destruction, and/or other disposition of each of the following:

(i)    all copies or phonorecords of the Recordings that Warner has made or used in violation of TPP's exclusive rights;

(ii)   all masters, tapes, or other articles by means of which such copies or phonorecords may be reproduced; and

(iii)  records documenting the manufacture, sale, or receipt of things involved in any such violation;

E. An order requiring Warner to provide an accounting of its profits attributable to its infringing conduct, including Warner profits from sales of any and all (i) products, works, phonorecords, or other materials that include, copy, are derived from, or otherwise incorporate or embody the Recordings; and (ii) public performances and/or playings of the Recordings.

F. An order requiring Warner to destroy or deliver up for destruction all materials in its possession, custody, or control used by Warner in connection with its infringing conduct, including without limitation all remaining copies and/or phonorecords of the Recordings and any products and works that incorporate or embody any reproduction or other copy or phonorecord of the Recordings;

G. An order requiring Warner, at its own expense, to recall the Recordings from any distributors, retailers, vendors, or others that have sold, distributed, publicly performed or played, or otherwise used the Recordings on Warner's behalf, and/or with Warner's permission, approval, inducement, and/or at Warner's instruction or

direction, together with any products, works or other materials that include, copy, are derived from, or otherwise incorporate or embody the Recordings, and that Warner be ordered to destroy or deliver up for destruction all such materials returned to it;

H. An award of Warner's direct and indirect profits obtained as a result of its infringing conduct, including but not limited to all profits from sales and other exploitation of the Recordings and any products, works, or other materials that include, copy, are derived from, or otherwise incorporate or embody the Recordings, or in the Court's discretion, such amount as the Court finds to be just and proper;

I. Establishment of a constructive trust for the aforementioned profits, in the Court's discretion;

J. An award of damages sustained by TPP as a result of Defendant's infringing conduct, in an amount to be proven at trial under 17 U.S.C. § 504 and U.K. Copyright, Designs and Patents Act 1988 § 19(96) and (97);

K. An award of Plaintiff's costs pursuant to 17 U.S.C. § 505;

L. An award of interest, including pre-judgment and post-judgment interest, on the foregoing sums; and

M. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Timothy R. Clinton*

CLINTON & PEED
Timothy R. Clinton (D.C. Bar 497901)*
1775 Eye Street NW, Suite 1150
Washington, DC 20006
(202) 919-9491
tim@clintonpeed.com
* *Application pro hac vice pending*

*Attorneys for Plaintiff*

- 24 -
COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SEALS PHILLIPS LLP**


By: */s/ Collin Seals*

COLLIN SEALS
*Designated Local Counsel for Plaintiff*
THE PRODUCTION PIT, LTD.